GEORGE C. PLATT *vs.* THE NEW YORK AND BOSTON RAILROAD COMPANY.

Private corporations may be subjected to compulsory insolvent proceedings, under the act of 1853, as much as natural persons.

And a railroad corporation as much as any other corporation.

The New York and Boston Railroad Company, a domestic corporation, became consolidated under the same name with a railroad corporation of the state of Rhode Island, and the corporation thus formed became again consolidated, under still the same name, with a railroad corporation of the state of Massachusetts; which consolidation was effected in each instance by proceedings authorized by the respective charters of the companies and confirmed by subsequent acts of the legislatures of this state and of Massachusetts. How far the original New York and Boston Railroad Company became thereby for all purposes merged in the consolidated corporations: *Quere.*

If to be regarded as still subsisting, for the purpose of enabling its creditors to proceed against it in any mode, it should be regarded as liable to proceedings in insolvency at their instance.

Whether our courts would have jurisdiction over such a consolidated corporation, for the purpose of insolvent proceedings: *Quere.*

Proceedings in insolvency instituted against the New York and Boston Railroad Company, in which they were described as a corporation organized under the laws of this state, and as a corporation created by the general assembly of this state, and located within this state, were held to be proceedings against the original New York and Boston Railroad Company, and not against the consolidated company, and were sustained as such against the objection of a party who had appealed from a decree in insolvency against the company, and had alleged in his appeal that he was interested as an attaching creditor of the original corporation and that his lien would be dissolved by the insolvent proceedings.

The office which the original company had, having been in Middletown in this state, and it not appearing that that company had removed its office to any other place, it was held that the company must be regarded as still having an office in Middletown, so as to give the probate court of that district jurisdiction over its insolvent estate, although, upon the first consolidation, the original company had wholly ceased to transact business.

As to the person to be regarded as the secretary of the company, for the purpose of serving process upon the company,—also as to the room to be regarded as the office of the company, for the same purpose,—also as to waiver of objection to insufficient service by appearance of the company ; see *infra.*

Under the insolvent act of 1853, it is not necessary that a regular service of the writ of attachment, on which the petition of a creditor is based, should be made on the debtor. It is only necessary that the debtor shall refuse to show to the officer, and the latter shall be unable to find, sufficient property of the debtor to secure the claim, and that the officer shall make return to that effect to the court of probate.

A judge of probate is not disqualified by having been previously retained or consulted as counsel in matters appertaining to an estate in settlement before him, where no objection is made on that account at the time by any party interested ; the statute limiting such disqualification to the case where such objection is made. (Acts 1855, chap. 25.)

This was a petition by George C. Platt to the court of probate of the district of Middletown, for the appointment of a trustee of the estate of the New York and Boston Railroad Company as an insolvent estate, brought before the superior court by appeal.

The petition to the probate court described the respondents as " the New York and Boston Railroad Company, a corporation duly established and organized under the laws of the state of Connecticut "—" having its office in Middletown in said probate district," and set forth an indebtedness of that corporation to the petitioner by a judgment which he had recovered, and which had not been paid—the issuing of a writ of attachment against the company in an action of debt on that judgment, which writ was set out in the petition and in which the defendants were described by the same name and as " a corporation duly created by the General Assembly of this state "—with the return of the officer thereon that he had made demand of Samuel L. Warner, as treasurer of the company for unincumbered property sufficient to secure the claim on which the writ was issued, and a like demand at the usual place of abode of James H. Stokes

as secretary of the company, but that neither had shown him such property, and that he was unable to find any property on which to levy the attachment. The probate court, on the presentation of the petition which was on the 27th day of April, 1857, assigned the 2d day of May following for the hearing thereof and ordered notice of the pendency of the petition and of the time of the hearing to be given to the respondents, which order was served by leaving an attested copy of the petition and order of notice with the said Samuel L. Warner as treasurer and secretary of the company, a like copy at the usual place of abode of the said James H. Stokes as treasurer and secretary of the company, and a like copy at an office in Middletown, supposed to be the office of the respondents, and more particularly hereinafter described.

Afterwards, while the petition was pending, sundry other creditors of the respondents filed their applications in the court of probate, under the statute, to be made parties petitioners to the proceedings.

At the time fixed for the hearing of the petition, the respondents appeared by their attorney, Walter S. Carter, Esq., and moved for an adjournment—and the hearing was thereupon adjourned to the 16th day of May,—and again on that day on the motion of the respondents' counsel, was adjourned to the 30th day of May—and was further adjourned from time to time on motion of the respondents' counsel, until the 27th day of June, 1857, when the respondents suffered a default. The court then found the facts alleged in the petition to be true and ordered that a trustee of the estate of the respondents be appointed under the provisions of the insolvent act, and on the 20th day of July, 1857, appointed Messrs. Gabriel W. Coit and Henry Dutton trustees, who accepted the trust.

On the 26th day of August following, John S. Edgerley and Daniel Edgerley, partners, appeared before the probate court, and took an appeal to the superior court from the decree of the court in granting the petition and appointing said trustees, claiming to be aggrieved thereby, and alleging

as their interest in the matter, that they were attaching cred-itors, who had within sixty days before the bringing of the petition, instituted a suit against the respondents in which they had factorized one Erastus Brainard as the agent and trustee of the respondents, and that, by means of the insol-vent proceedings if sustained, their lien upon the goods of the respondents in the hands of the said Brainard would be destroyed.    Their appeal was allowed and the case was entered in the superior court.    The appeal embraced also certain other orders made by the court for the settlement of the estate, but as all the questions in the case arise upon the appeal from the first mentioned decree, no further notice is taken of these orders.

In the superior court the appellants assigned as reasons of appeal:

1. That there was no demand on the company by the offi-cer serving the writ of attachment sued out by said Platt against the company and upon which the petition to the court of probate was founded, other than by the officer mak-ing demand at the usual place of abode of James H. Stokes, described in his return as the secretary of said company, and also by the officer making demand of Samuel L. Warner, described in said return as being the treasurer of the com-pany ; and that there was no service of the writ on the com-pany, except a pretended service by the officer, by reading the writ in the hearing and presence of said Warner, as said treasurer, and by leaving a copy of said writ and declaration with said Warner, at the alleged office of the company in Middletown, and also by leaving a copy of the same at the usual place of abode of said Stokes, as secretary of the com-pany ; which were not a demand and service on the said New York and Boston Railroad Company, because the said Stokes was not at the time the secretary of the company, but a long time previous thereto the directors of the com-pany had removed him from the office of secretary of the company, and had chosen in his place Marshal S. Rice, who was at the time of the service of the writ, and ever since had been, the secretary of the company; and because that at

the date of said pretended service, and for a long time previous thereto, the said New York and Boston Railroad Company had had no office or principal place of business in said Middletown, nor within the probate district of Middletown, and for a long time before the service of the writ had ceased to do business in said Middletown.

2. That the judge of probate for the district of Middletown, was, at the time of passing the several decrees appealed from, disqualified to act, because he had acted as the attorney of the petitioner, in the very matter on which said petition was founded; and had that claim and all the others filed in said probate court, in his hands for the purpose of collection, before the same were filed in said court.

3. That at the time said writ was sued out by said Platt, and said decrees were made by said court of probate, and long before, and ever since, the New York and Boston Railroad Company, which was originally established by the resolution of the General Assembly of this state in 1846, was united, amalgamated, merged and consolidated, under that name, with the Woonsocket Union Railroad Company, a corporation which was lawfully established under the laws of Rhode Island, and the Charles River Railroad Company, a corporation which was lawfully established under the laws of Massachusetts, the capital stock of each of said companies forming the capital stock of said united company, the stockholders thereof being the stockholders of said united company, and said united company having all the powers, rights, privileges and franchises which had been granted to said companies individually; said union and merger having been effected by the mutual agreement of said companies in accordance with the provisions of their respective charters, and ratified, validated and confirmed by the legislatures of the states of Connecticut, Rhode Island and Massachusetts, in the years 1854 and 1856; and which union and merger had never been repudiated by any of the parties thereto, nor vacated or annulled by either of the legislatures of said states; and ever since which union and merger the said New

York and Boston Railroad Company had transacted all its business and elected its officers as one united company.

The answer of the appellees to these reasons of appeal was essentially a denial of the facts alleged, but the last reason assigned was claimed to be also insufficient in law.

Upon the trial of the case, upon the reasons of appeal, the court found the following facts :

The New York and Boston Railroad Company was chartered by the legislature of the state of Connecticut in the year 1846, with power to construct a railroad from the city of New Haven to the city of Middletown, and thence easterly through the town of Windham, to the east line of the state, and to make joint stocks with any other railroad corporation, with a provision that if the company did not expend $500,000 on their road within three years, and did not complete it within six years, their powers and privileges should terminate. By a resolution passed by the general assembly in 1849, this provision was repealed and the company were allowed three years from that time within which to expend $300,000 on their road and six years, within which to complete it, with a forfeiture of their charter if such expenditure and completion were not effected. A further resolution in 1852, extended the time for the expenditure of the $300,000, to two years from that date, and a further like extension was granted in 1854 and another in 1856. The resolution passed by the legislature in 1849, authorized the company to connect and make joint stock or common interest with any other railroad company or companies in respect to the whole or any portion of the road or roads of the said company or companies. The company soon after the granting of its charter was duly organized, and had its principal office and place of business at Middletown in this state.

The legislature of Rhode Island, in the year 1850, chartered a railroad corporation by the name of the Woonsocket Union Railroad Company, with power to construct a railroad from the line of the state of Massachusetts, near the village of Woonsocket, to the line of the state of Connecticut, and with power to unite with railroad companies in the

states of Massachusetts and Connecticut. The company was soon after duly organized and had its principal place of business in Woonsocket in the state of Rhode Island. The 21st section of the charter, which gave the power to unite with companies in other states, was as follows:

" The said Woonsocket Union Railroad Company is hereby authorized to unite with any railroad company which has been or may be empowered by the legislature of the state of Connecticut to construct a railroad to the westerly terminus of- the railroad authorized by this act, or with any railroad company which may be or has been authorized by the state of Massachusetts to construct a railroad to the easterly terminus of the railroad authorized by this act, or with either of said companies. And when the companies shall have been so united the stockholders of one company shall become stockholders in the other companies or company. And the companies thus united shall constitute one corporation, by such name as the united companies may adopt. And all franchises, property, powers and privileges, granted or acquired under the authority of said states respectively, shall be held and enjoyed by the said stockholders in proportion to the number of shares or amount of property held by them respectively in either or both of said corporations."

Later sections provided that two or more of the directors of the new company should at all times be inhabitants of that state, that separate accounts should be kept of the expenditures on the road in the different states, and that commissioners appointed by the different states should decide from time to time what portion of all the expenditures and receipts properly pertained to the parts of the road lying in the different states, and that the company and the stockholders, so far as the road was situated in that state, should be subject to the duties and liabilities of the Woonsocket Union Railroad Company and to the general laws of the state to the same extent as if the whole line of the road had been located within the state. By the 26th section, the railroad company was authorized in lieu of the union provided. for in the preceding sections, to unite with any other railroad

Platt *v.* New York and Boston R. R. Co.

company by leasing their road, or taking a lease of the road of such other company, or by any other contract duly entered into between the companies.

Under the power thus conferred on the Woonsocket Union Railroad Company, and under that conferred on the New York and Boston Railroad Company by the provision of the charter of the latter company authorizing it to make joint stock with other railroad companies, these two corporations united, as one company, under the name of the New York and Boston Railroad Company ; and the court found that a contract of merger, amalgamation and consolidation between the two companies was entered into, and that every thing was done by the companies that could be done under their charters respectively towards the consummation of such merger, amalgamation and consolidation; and that from and after March 14, 1853, the two companies ceased doing business as separate companies, and that all the business was thereafter done by the consolidated company, as one company under the name of the New York and Boston Railroad Company ; and that thereafter the stockholders of both companies, as stockholders of the united company, chose a single board of directors, two of whom were from the state of Rhode Island.

No further action was had upon the subject of the union of the two companies by the legislature of Rhode Island, but the Legislature of Connecticut, at its session in May, 1854, passed the following resolution :

" Whereas, the New York and Boston Railroad Company have under the provisions of their charter, united and made joint stock with the Woonsocket Union Railroad Company, a corporation established under the laws of the state of Rhode Island, thereby forming one company under the name of the New York and Boston Railroad Company.

" Resolved by this Assembly, That the proceedings of the said companies, whereby they became so united and merged as one company, be and the same are hereby validated and confirmed, and the capital stock of said companies shall together form the capital stock of said united company; and the stockholders of each of said companies shall be

stockholders of the said united company, which shall have all the powers, rights, privileges, and franchises now enjoyed by, or which may be hereafter granted to, the New York and Boston Railroad Company in this state. And the said united company and the stockholders thereof, so far as the road shall be situated within the limits of this state, shall be subject to all the provisions of the charter of the New York and Boston Railroad Company granted in this state, and the acts amendatory thereof, and the laws of this state, in the same manner as if the whole line thereof had been located in this state."

A stockholders' meeting of the consolidated New York and Boston Railroad Company was held at Middletown, in this state, in October 1854, and by adjournment from time to time at the same place, until May, 1855, when a new board of directors was elected, two of whom were from Rhode Island. There was no other meeting of the stockholders of this company, until the meeting for accepting the terms of merger with the Charles River Railroad Company, hereafter referred to.

The company had offices in Middletown, Woonsocket, and Boston, at which places the directors from time to time held meetings. Two of the directors had been stockholders of the Rhode Island Company, and were stockholders of the New York and Boston Railroad Company only by virtue of the consolidation. The president, secretary, and treasurer resided at Middletown. James H. Stokes was elected secretary by a board of directors chosen by the consolidated company in July, 1855, and had never been secretary or clerk of the original New York and Boston Railroad Company. The president, secretary, and treasurer resided in Middletown, and were stockholders of the original New York and Boston Railroad Company at the time of the amalgamation. It did not appear that they were stockholders of the Woonsocket Union Railroad Company before that time.

In March, 1855, the legislature of Massachusetts passed an act authorizing the Charles River Railroad Company, which had previously been chartered with power to construct a railroad from the city of Boston to the line of the state of

Rhode Island, to unite with the New York and Boston Railroad Company. The language of the act was as follows:

"The Charles River Railroad Company, and the New York and Boston Railroad Company, a corporation established under the laws of the states of Rhode Island and Connecticut, (or any railroad company which now is or may be authorized to unite its railroad stock with the stock of the Charles River Railroad Company,) are hereby authorized to unite themselves in one corporation, upon such terms as shall be agreed upon, whenever a majority in interest in each of said companies shall, by a vote at meetings called for the purpose, decide so to unite. And when such votes shall have been passed by said corporations, they shall thereupon become one corporation, under such name as after such union shall be adopted, and all the franchises, property, powers and privileges now enjoyed by, and all the restrictions, liabilities and obligations imposed upon, such corporation or corporations by their respective charters, shall appertain to such united corporation in the same manner as if the same had been contained in or acquired under an original charter; and the said Charles River Railroad Company shall not, by any such union with any other company, be thereby released from any liability or obligation under which they now are to any person or corporation, but such liabilities and obligations may be enforced against the united corporation, in the same manner as they may now be enforced against the Charles River Railroad Company." The act also provided that one or more of the directors of the united corporation should be resident in the state of Massachusetts, and that the company should be held to answer to legal process served on such director. Also that a separate account should be kept of the expenditures in the different states, and that a board of commissioners should decide from time to time what portion of the expenditures and receipts properly pertained to the different parts of the road.

The directors of the New York and Boston Railroad Company had been for some time directors of the Charles River Railroad Company, and one of them its president, and so

continued to be up to the time of its merger with the New York and Boston Railroad Company.

A contract of merger, amalgamation and consolidation between the New York and Boston Railroad Company and the Charles River Railroad Company, and certain by-laws, were adopted by the boards of directors and a majority in interest of the stockholders of the two companies respectively, at meetings duly held for the purpose, and subsequently the stockholders of both companies, meeting as one company, ratified and adopted the same, at a meeting duly held for the purpose; and after October 3d, 1855, the two companies ceased doing business as separate companies, and all the business was subsequently done by the consolidated company as one company, under the agreed name of the New York and Boston Railroad Company.

The articles of agreement and by-laws were entered in full upon the books of record of the respective companies, and of the subsequently consolidated company. The last part of the agreement was as follows:

"And these presents shall take and have effect and be in full force and operation when and from and after the time when the same, or provisions corresponding strictly with the foregoing, shall have been duly accepted, voted and adopted by the New York and Boston Railroad Company, so established under the laws of the states of Rhode Island and Connecticut, as well as by the Charles River Railroad Company, so established under the laws of the state of Massachusetts, and a majority in interest of each of said companies shall, at meetings called for the purpose, duly have decided so to unite. And the said company or companies, respectively, by the undersigned, who at the time of the foregoing vote and action were respectively president or clerk of such company or companies as below indicated in connection with the signatures of the undersigned respectively, do hereby, and in pursuance of the power and authority under such vote and action of such company or companies, and of the board of directors thereof, now affix the corporate seal

and name of such company or companies to the premises, and fully affirm, execute and deliver the same."

These articles of agreement were entered on the records of each company, and those so entered on the records of the New York and Boston Railroad Company were signed and sealed by its president and clerk, and a place was left for the signature of the president and clerk of the Charles River Railroad Company, with a seal affixed, but the same were never signed by them. The articles entered on the records of the Charles River Railroad Company were in like manner signed and sealed by the president and clerk of said company, and a place left and seal affixed for the signatures of the president and clerk of the New York and Boston Railroad Company, but were never signed by them. The officers of the latter company went to Boston with their records to have the agreement signed by both parties, but the books of the Charles River Company were in the hands of their attorney, who claimed a lien upon them, and they could not be obtained for the purpose.

After the adoption of the contract of union by the directors and stockholders of each company, a meeting of the stockholders of the united company was held at Middletown in October, 1855, by adjournment thereto of each prior separate meeting of stockholders, and also by virtue of a call under the provisions of the by-laws. The notice called the meeting at the office of the company in Middletown. At this meeting the articles of agreement, contract of consolidation, and by-laws were adopted, ratified and confirmed, and a board of directors was chosen, of whom three were from Massachusetts, and were stockholders of the new company only by virtue of having been stockholders of the Charles River Railroad Company. The new company had an office in Middletown and in Boston. The first president and secretary resided at Middletown. The new company adopted the name of the New York and Boston Railroad company, and the contract of union or merger was entered in full upon the records of the united company, signed by the first president and secretary of the united company, with the

seals of both the old companies, one of which was also the seal of the new company. The directors held meetings at Middletown, Boston, and Woonsocket, from time to time. James H. Stokes, who was secretary of the New York and Boston Railroad Company after the amalgamation with the Woonsocket Union Railroad Company, was elected treasurer and secretary of the new company.

The legislatures of Massachusetts and Connecticut, in the year 1856, severally passed acts confirming the union of the two companies. That of the latter state provided " that the union of the New York and Boston Railroad Company with the said Charles River Railroad Company of Massachusetts, by which they have become one company, under the name and title of the former, be and the same is hereby ratified, validated, and confirmed, so that the stockholders of both said companies shall be stockholders of the said New York and Boston Railroad Company, and shall possess all the rights, privileges and franchises appertaining to and enjoyed by the said New York and Boston Railroad Company within the limits of this state, and be subject, as regards the portion of the said road of the said New York and Boston Railroad Company which lies within this state, to the laws of this state, the same as if the whole of said road of the said New York and Boston Railroad Company lay within the limits of this state. Provided that nothing herein contained shall be so construed as to authorize the said united company or corporation so formed to remove its principal office and treasury without the jurisdiction of this state; or to authorize the proceeds of the existing subscription made prior to the passage of this act, to the capital stock of the New York and Boston Railroad Company, under its charter from this state, to be paid out for any debts or liabilities of any kind incurred by said railroad companies prior to their merger with the said New York and Boston Railroad Company; and provided that there shall be at least four directors of said united company or corporation residents of this state."*

---

* I have stated the facts relating to the consolidation of the companies

James H. Stokes, who had been elected treasurer and secretary of the new company, after the final consolidation, continued to hold those offices until the 31st of December, 1856, when, at a meeting of the directors holden at Middletown, Samuel S. Warner, of Portland in this state, was chosen treasurer, and Marshall S. Rice, of Newton in the state of Massachusetts, was chosen secretary. A meeting of the stockholders was holden on the day preceding, at the same place, at which a resolution was passed confirming the action of a meeting of the stockholders in Woonsocket in the preceding October in the election of directors, and certain persons were elected to fill vacancies in the board of directors. A question was made as to the legality of the election of this board of directors, and the election of Rice as secretary was claimed to be illegal, but the details of these questions are not important to the present case in the view of it taken by this court. Mr. Stokes, as secretary, called together the new board of directors elected at the meeting at Woonsocket, early in November, 1856, and attended their meeting, but did not recognize them as lawfully elected and made no record of their doings, and stated that he should not meet with them again;—after which he performed no official act as secretary, and declined to act as such at the meeting of the stockholders in December following. He however kept the keys of the office and of the safe of the company at Middletown.

On the 12th of December, 1856, the office of the company at Middletown was entered by an officer with a writ of attachment on a claim against the company, and the safe and furniture taken and removed. Nothing was left except papers, maps, &c., of no value except to the company, and these remained until taken away by one of the trustees in insolvency. The office was not occupied for any other company purpose, after the meeting of the 30th of December, 1856. The safe and furniture were sold on execution, and

somewhat more fully than the purposes of the present case require, that the same statement may suffice, by reference, for the case of *Bishop* v. *Brainard*, (Middlesex Co. March T. 1859,) hereafter to be reported, and which involves the same details.                                                        R.

were bid in by the treasurer, Mr. Warner, with the expectation that the company would indemnify him therefor and take them back. Mr. Warner had an office with a safe in it at Portland, and was requested by the president to carry the papers of the company there for safe keeping. Some of them were so carried and kept; but it was not found that the board took any action respecting them, or that it was the intention of the president to constitute the office of Mr. Warner, in Portland, the office of the company, or that any thing further was done to make it such. The sign of the company was removed to Portland but was not put up there. Mr. Warner had a conversation with Mr. Carter, of Middletown, the attorney of the company, with a view to an arrangement to hire and fit up a room to contain the safe and books of the company, to be used by the committee and by the company, and by Mr. Carter as a law office, and by himself as a place of business when in Middletown. He afterwards abandoned the idea, but Mr. Carter, without knowledge of the fact, hired the room and fitted it up, and it had been since occupied by him as a law office, Mr. Warner also transacting business there as he had occasion. The safe, and the furniture, with the exception of a few writing desks and other articles, were not removed to this room. The safe, when opened, was found not to contain the books of the company, and as proceedings in bankruptcy were expected, and the safe was heavy and its removal expensive, it was not removed. The company, by reason of the condition of its affairs, had not used or required the use of any office in this state since the 1st of February, 1857. But the court found that if any such had been required before the proceedings in bankruptcy, the office occupied by Mr. Carter would probably have been used by the company, pursuant to an intention entertained prior to the leasing of it by him, and that Mr. Warner gave the officer who served the writ upon which the proceedings in bankruptcy were based to understand that the room so hired by Mr. Carter was the office of the company if there was any such in Middletown.

The court further found that the writ of attachment was

served as stated in the officer's return on the same; that a copy was left with said Warner as treasurer of the corporation, at the office in Middletown so represented by him to be the office of the company; that the officer who served the writ made reasonable enquiry to ascertain where was the office or principal place of business of the corporation, and acted in good faith in leaving the copy with said Warner, and at said place; that a certified copy of the petition to the court of probate was left by the officer who served the same at the same office, as the office of the corporation, and that the same came into the hands of W. S. Carter; that the said Carter had been previously employed as counsel by the board of directors elected at the meetings of the company in October and December, 1856, and that as such he appeared before said court of probate; that such appearance was continued by him till after the petitions of the other creditors were filed, and that he made no objection to the sufficiency of the service of either the writ of attachment or of the petition; and further, that he made no objection to the jurisdiction of the judge of probate or to any want of qualification in the judge.

The court further found that the judge of probate, some time previous to the presenting of said petition, had had in his hands for collection the claim of said Platt on which the writ of attachment was brought; that he prosecuted the same to final judgment and execution, and collected the greater part of the amount due from the corporation to Platt; but that on the 27th day of January, 1857, he settled with him and delivered over the balance of the claim to him, and had nothing further to do with the same; that previous to the presentation of the petition he had had in his hands a claim in favor of one Norman Smith against the corporation, on which he had caused a factorizing suit to be brought; that the case had gone into judgment against the corporation, but was still pending against the garnishees, debtors of the company, but that the factorizing lien had become perfected long before the petition was brought, and that the claim was fully secured by the factorizing process; and that

he had no authority from said Smith to collect the debt in any other way than by the factorizing suit; and that certain factorizing suits were brought less than sixty days before the petition was brought, in which certain debtors of the corporation were factorized, in which he was employed by the debtors to defend against the factorizing suits, and for no other purpose.

The questions of law arising on these facts were reserved for the advice of this court.

*Culver* and *Calef*, for the appellants.

1. Railroad corporations are not liable to compulsory proceedings in insolvency, under the insolvent act of 1853. 1st. There is no positive provision of the statute authorizing such proceedings against any corporation. If the terms of the statute are such as to authorize corporations to avail themselves of its provisions so far as to make voluntary assignments, it by no means follows that they may be subjected to insolvent proceedings against their will, at the instance of their creditors. It is very clear that some kinds of corporations can not be regarded as within the intent of the act, as towns, cities, school districts, &c. 2d. The principal and most valuable portion of the property of a railroad company could not be distributed among its creditors, or made available for the payment of its debts, like the ordinary assets of an insolvent debtor. This is obvious from the fact that the trustee would not be invested with the franchise of the company, and could not sell, lease, or operate the road. *Beman* v. *Rufford*, 6 E. L. & E., 106. *Winch* v. *Birkenhead, &c. R. R. Co.*, 13 id., 506. *Johnson* v. *Shrewsbury & Birmingham R. R. Co.*, 19 id., 584. *Ammant* v. *New Alexandria & Pittsburg Turnpike Road*, 13 Serg. & R., 210. *Susquehannah Canal Co.* v. *Bonham*, 9 Watts & Serg., 27. *Nelson* v. *Vermont and Canada R. R. Co.*, 26 Verm., 721. *De Ruyter* v. *St. Peter's Church*, 3 Barb., Ch. 119. *N. Y. and Maryland R. R. Co.* v. *Winans*, 17 How., 30. 3d. It would be injurious to its creditors to carry a railroad company into insolvency, because, for the reasons above suggested, the

Platt *v.* New York and Boston R. R. Co.

source of its income would be immediately dried up, and its means of paying its debts taken away. 4th. The community at large would be essentially injured by the consequent interruption of public travel and of the transportation of property and the public mails. 5th. If any corporations are subject to proceedings in insolvency, it would seem as if none could have been intended except such as are of a strictly private nature. Acts 1856, p. 79. A railroad company, though having some of the essential qualities of a private corporation, is yet, in many important respects, rather of the nature of a public one. A railroad is an improved public highway, and the land taken for it is regarded as taken for public use. It is only on this ground that the right to take private property for railroad purposes can be vindicated under the constitution. *People* v. *White*, 11 Barb., 31. *Hooker* v. *Utica &c. Turnpike Co.*, 12 Wend., 371. Ang. on Highways, 10. *White River Turnpike Co.* v. *Vermont Central R. R. Co.*, 21 Verm., 190. *Railroad* v. *Norton*, 24 Penn., 465. *Newburyport Turnpike Co.* v. *Eastern R. R. Co.*, 23 Pick., 326. *Commonwealth* v. *Wilkinson*, 16 id., 175. *Beekman* v. *Saratoga and Schenectady R. R. Co.*, 3 Paige, 45. 6th. The statute ought not to be so construed as to make it embrace cases that are not within its real intent, though they may be within its letter. Smith on Stat. Construction, 701–707.

2. The insolvent proceedings in the present case must be regarded as taken against the original New York and Boston Railroad Company. The debtor is described as a company of that name, established under the laws of the state of Connecticut, and having its office in Middletown, and in the writ on which the preliminary demand was made, the defendants are described by the same name and as a corporation created by the general assembly of this state and located and having its place of business in Middletown. All parts of these descriptions apply precisely to the original Connecticut corporation, and not to the consolidated corporation, which was created by the legislation of the three states and not by that

of Connecticut alone, and which is not located in this state, but in the three states.

3. This original corporation was not in existence when the petition was brought. It is expressly found that it was merged, so far as a merger could be legally accomplished, in the corporation formed by consolidating the Connecticut and Rhode Island corporations,—and that this new corporation was afterwards merged in another formed by its consolidation with the Massachusetts corporation. This union of the companies was not only originally authorized by their respective charters, but was afterwards confirmed by the legislatures of the states of Connecticut and Massachusetts. The original Connecticut corporation had therefore ceased to exist, if the merger was one that was good in law.

4. The consolidation of the companies was good in law, and a legally established consolidated corporation, absorbing the original companies and entirely superseding them, was the result. Such a consolidation has been recognized as valid by the supreme court of the United States. *Wilmington R. R. Co.* v. *Maryland*, 10 How., 376. *Phila., Wilmington and Balt. R. R. Co.* v. *Howard*, 13 id., 307. Such an union is not against public policy. Roads forming a continuous line through several states can manifestly be more successfully managed as one road, and by one board of directors, than where the portions of the road within the different states are treated as separate roads and held by separate corporations. No state can, against the consent of another state, grant a franchise within the limits of such other state, but the two states, by united legislation, can grant a common franchise that shall extend through them both. There is nothing in our state constitution which prohibits such legislation. We are to look there, not to see what power the legislature possesses, but how far that power is limited—the constitution being a limitation, not a grant of power. *Starr* v. *Pease*, 8 Conn., 541. *Pratt* v. *Allen*, 13 id., 119.

5. If it be claimed that the corporation against whom the present proceedings have been brought, is not the original Connecticut corporation, but the consolidated corporation,

then we say that the latter corporation can not be held subject to such proceedings before our courts. 1st. The corporation being a unit, it can not be divided so that a part shall go into insolvency and a part not. The whole corporation must be carried into insolvency, or no part of it. 2d. It will not do for our courts to assume jurisdiction over the whole corporation, because we should at once come into collision with the courts of the other states, which would have an equal jurisdiction over the whole corporation. 3d. The property of the corporation, except the mere bed of the road, has no location within one jurisdiction rather than another, so as to determine the right of a trustee appointed by our courts to any particular part of it, as distinguished from any other part that might fall to the jurisdiction of another state. The trustee must have a right to all the movable property or to none of it. If not, no rule of division could be adopted. 4th. It is no objection to this view, that the corporation would not be liable to insolvent proceedings in any of the states,—for the legislature of either of the states could have made it a condition, in granting the power to consolidate, that the new company should be, in whole or in part, under its jurisdiction for the purpose of such proceedings,—and not having done so, it is to be presumed that such exemption from insolvent proceedings was intended. The property of the company would still be open to all other processes for the enforcement of claims against it.

6. If the consolidated company is liable to these proceedings, then we claim that the proceedings are invalid for several reasons. 1st. Stokes, upon whom the petition was served, was not secretary of the company at the time. He had been superseded and was not claiming to act as secretary. He was thus neither *de jure* nor *de facto* secretary. 2d. The writ of attachment on which the petition was based, was not legally served, the demand having been made, and the copy left in service by the officer, at an office, as the office of the company, which was not and had never been the office, either of the consolidated company or of the original company. 3d. The probate court of the district of Middle-

town had no jurisdiction. Stat., (ed. 1854,) 515, sec. 5.
By the statute that court only can take jurisdiction where a
corporation has its office or principal place of business. Nei-
ther the new corporation nor the original one had at the
time any place of business whatever within that district.
4th. The intentions of Warner and Carter with regard to fit-
ting up an office can have no effect. *Hartford Bank* v. *Hart*,
3 Day, 491. 5th. The appearance of Carter, as attorney for
the respondents, before the probate court, can not amount to
a waiver of the want of jurisdiction, which can never be
waived, nor of the want of service,—certainly as against
the appellants, whose rights ought not to be affected by what
a stranger may have done.

7. If the court had jurisdiction, yet the judge who made
the decrees appealed from was disqualified to act, by reason
of having been counsel in divers matters appertaining to the
settlement of the estate, and affected by the decrees. Acts
1855, Ch. 25, p. 24.

*Dutton*, (with whom was *Barnes*,) for the appellees.

1. The consolidation of the original corporations was
never effected. 1st. The instruments necessary for that effect
were in fact never signed. 2d. The resolutions of the gen-
eral assembly of this state, passed in 1856, confirming the
consolidation, required as a condition that four directors from
this state should be appointed, which was not done.

2. The consolidation, if effected, was a mere union of the
three companies, and not a merger of them in a new single
corporation. 1st. A corporation can not enjoy a franchise,—
can not properly have any existence,—beyond the limits of
the sovereignty which created it. Ang. & Ames on Corp.,
§ 104. *Bank of Augusta* v. *Earle*, 13 Pet., 519, 588. *Run-
yan* v. *Lessees of Coster*, 14 id., 129. *Miller* v. *Ewer*, 27
Maine, 509. *Farnum* v. *Blackstone Canal Co.*, 1 Sumn., 47.
2d. A corporation can not hold a legal corporate meeting
without the limits of the state creating it. *Miller* v. *Ewer*,
supra. 3d. The states are distinct sovereignties, and such
sovereignties can act with each other only by treaty. If

therefore such a merger could have been effected by proper action on the part of the different states, the action had was not effective for that end.   4th.  The consolidated corporation, if a single corporation as claimed, would extend in this case through three states, and each state, having necessarily a jurisdiction over the corporation, would be possessed of a jurisdiction beyond its limits.  5th.  The corporation would be subject to the separate legislation of three distinct sovereignties, and liable to be controlled by each, a result to which no court would willingly come.  6th.  The statutes of the three states regarding railroad companies, their rights and duties, are in fact very different in the different states.

3.  So far as a liability to our insolvent proceedings is concerned, it makes no difference whether the original company still exists, or is merged in the new company.  The new company would then be a corporation existing, in part, within this state, and having property real and personal within the state.  The insolvent act, in using the terms " *any* person, &c.," intends that no debtor shall be exempt from the application of the law, who is within the state or has property within it.   How far the rights of the trustee will extend, as to personal assets out of the state, is a question to be settled afterwards.  It is enough to confer jurisdiction that the corporation is in fact here, none the less here for being in part elsewhere, and that it has property here.  It is not to be presumed that the courts of the other states will deny the jurisdiction of this court, or the right of the trustee to any of the personal property, since all the assets would be appropriated for the equal benefit of all the creditors of the corporation.   If the jurisdiction over the property is to be regarded as concurrent, then either state, first asserting jurisdiction, would probably be allowed to retain it, especially where the jurisdiction was taken only for the purpose of an equal distribution of the avails among all the creditors.   At all events, the jurisdiction over the real estate within this state, and over the personal property of the corporation found within this state, would be undeniable, and this would be enough to sustain proceedings in insolvency against the corporation.

Stat. (ed. 1854) 512, 513.    Acts 1855, 84.    4 Private Acts, 1010.

4. Railroad corporations are liable to be proceeded against by their creditors, under the insolvent act of 1853, as much as any other corporation, and as much as natural persons. The statute clearly intends to embrace corporations. The first section provides for a voluntary assignment by " any person, persons, or corporation," and the 5th section directs as to the probate court that shall have jurisdiction in the case of " insolvent corporations." It certainly can not be claimed that a party who may avail himself of the law for the purpose of making a voluntary assignment, may not be subjected to its compulsory proceedings at the instance of his creditors. And if a corporation may be proceeded against in any case, there is no good reason why a railroad corpora tion may not. It is only a private corporation, like a bank, or manufacturing company.

5. The probate court of the district of Middletown had jurisdiction. Insolvent Act of 1853, sec. 5. The finding shows conclusively that Middletown was the place of business of the corporation. It had been the place of business of the original corporation, and the new corporation made it one of its places of business,—and no new place of business in this state had been established. Even if the corporation had ceased to do business there, yet having no other place of business in the state, the court will regard that as its place of business for the purpose of enabling its creditors to bring insolvent proceedings against the corporation.

6. The service of the writ of attachment, on which the petition is based, was sufficient. Stokes continued to be the secretary of the new corporation, the appointment of Rice, by whom he is claimed to have been superseded, not having been a legal one. The meeting at Woonsocket was not a legal meeting according to the by-laws, that place not having been designated therein as a place for holding meetings. Besides, some of the directors there appointed were not stockholders and therefore could not be directors. It was not therefore a lawful board of directors by which a succes-

sor to Stokes was appointed, and he therefore remained in office. But however this may be, the service of the writ of attachment was sufficient, as all that is necessary is that the officer demand and search for property and make return that he can not find sufficient, as was done in this case;—a complete service of the writ, as in an ordinary case, where a suit is to be carried forward to judgment, not being intended by the statute. Insolvent act of 1853, sec. 2.

7. The service of the petition was sufficient. Stokes was legally secretary, and the place where the copy was left was sufficiently the office of the company. As the company had no other office in Middletown, the court will regard the office in question, upon the facts proved, as the office of the company. The court will not allow the process to fail, where the best service was made that in the circumstances could be made. But even if the service was defective, the appearance of Mr. Carter, the attorney of the company, without making objection to the want of service, is a waiver of the objection. And so far as the objection ever could be made, it was the personal right of the company to make it, and not of these appellants, who at any rate can not make an objection which the company has waived.

8. The judge of probate was not disqualified. He was not in fact so connected with any matter involved in the settlement of the estate as to make it improper for him to sit ; and if he had been so, it was incumbent on any party disposed to object, to make the objection before the judge himself, and not before the higher court after an appeal. Acts of 1855, Ch. 25, p. 24.

STORRS, C. J. In disposing of this case, we shall confine ourselves strictly to the questions which are presented on the record, without undertaking to decide several others which have been argued before us, but which we think are not now regularly presented. Pursuing this course, we shall not consider the questions made, as to the effect of the supposed consolidation or union of the three original corporations, chartered respectively by the states of Connecticut, Rhode

Island, and Massachusetts; questions which the parties appear to be especially desirous that we shall determine, but which, as they are very important and attended with difficulty, and are not, in our opinion, presented on this record, we deem it proper to defer until it shall become necessary for us to decide them.

The case has been treated on both sides, in some parts of the argument, as if a consolidated corporation, formed out of those three corporations, is the one which was attempted to be put into insolvency before the probate court for the district of Middletown. We think, however, that the proceedings before that court were instituted, not against such a corporation, but against the original corporation called The New York and Boston Railroad Company, which was chartered by the legislature of Connecticut, in 1846,—that the latter is therefore the only corporation before that court, —and that it is in respect to that corporation only that those proceedings, or their regularity, are to be here considered and determined.

The original petition to the court of probate, instituted by Platt, alleges that he is a creditor of " The New York and Boston Railroad Company, a corporation duly established and organized under the laws of the state of Connecticut, whereof" the individuals therein named " are stockholders and members, having their office in Middletown;" a description which corresponds exactly with the corporation of that name which was created in 1846 by the legislature of this state, but which is wholly inapplicable to one which has been consolidated with several other corporations created under the laws of other states, and merged and united with them into one substituted corporation by virtue of the laws of the several states by which they were originally incorporated. It proceeds to state that he has commenced a suit by attachment for the recovery of his debt against the corporation thus described; sets forth, at large, the proceedings on that attachment, which are those required by the insolvent act of 1853, in order to lay the foundation for an application to the court of probate for the relief therein provided for the

creditors of insolvent debtors; and concludes by praying that court to appoint a trustee to take possession of the property of that corporation, and to proceed therewith pursuant to that act. And the petitioner's attachment, which is set out in his petition, appears to be against the same corporation as that of which he alleges that he is a creditor, and which is described in that attachment in the same terms in which it is described in the petition. The subsequent applications to the court of probate, of Sage, and Hinchfield, and the executors of Jarvis, to be made parties to the proceedings of Platt, allege that they are creditors of the same corporation, which is called by the same name, and similarly described. And all the decrees and orders of that court are conversant with that corporation only. Indeed, the appellants in this case professedly and in terms take their appeal from the decrees and orders of that court in the settlement of the estate of the same corporation. It is of that corporation alone that they allege they are creditors, and their complaint is that the proceedings in that court will dissolve their attachment against it as such creditors; which obviously could not be the case if the corporation against which those proceedings were had were another than that of which they were creditors. In short, there is not, either in the petition to the court for the appointment of a trustee, or in any of the subsequent proceedings before that court, any mention of or allusion to any other corporation than that which was incorporated by the legislature of this state, by the name of the New York and Boston Railroad Company, and which is located at Middletown.

The first that we hear of any other corporation, is after the appeal was taken in this case, and when the appellants file their reasons for that appeal in the superior court. In the last of those reasons, after having in those which preceded it treated the proceedings of the court of probate as having been instituted against the original Connecticut corporation, and urged their invalidity on the ground that they were its creditors, and had secured their claim against it by a writ of foreign attachment, they allege that when, and

long before, and ever since the attachment of Platt was sued out, which laid the foundation of those proceedings, and when the decrees and orders were made from which they had appealed, the said New York and Boston Railroad Company, referring to the corporation previously described and which was incorporated by this state, was united, amalgamated, merged, and consolidated, under that name, with two other certain corporations severally established under the respective laws of Rhode Island and Massachusetts, the capital stock of each corporation forming the capital stock of said united corporation, and the stockholders thereof being the stockholders of said united corporation, having all the powers, rights, privileges, and franchises which had been granted to said corporations individually; that said union and merger being effected by the mutual agreement of said corporations in accordance with their respective charters, and ratified, validated, and confirmed by the legislatures of Connecticut, Rhode Island and Massachusetts, in 1854 and 1856, has never been repudiated by any of the parties thereto, nor annulled or vacated by either of the legislatures of said states, and that ever since said union and merger was so effected, the said New York and Boston Railroad Company have transacted all their business and elected their officers as one united company. In whatever aspect the facts stated in this last reason be considered, we are unable to perceive their pertinency to this case. They are clearly of no importance unless they show, as the appellants claim, that the effect of the alleged union and merger was, not only to create a new corporation, but also to dissolve and put an end to the original Connecticut corporation. If the latter corporation was not thereby dissolved or extinguished, but a new one only was created, (on neither of which questions do we deem it necessary to express any opinion,) it is obvious that the creation of such new corporation presents no impediment to the proceedings which have been instituted against the original Connecticut corporation, as the latter, in that case, still retains its existence, and is as liable to be proceeded against under our insolvent act, as if the new corporation, from which it is entirely

distinct, had not been created. If the claim of the appellants is well founded, that the original Connecticut corporation became dissolved and extinguished to all intents and purposes by the effect of the union and merger, it results that that corporation was thereby ended from thenceforth and has now no existence. But the appellants admit, in their motion for this appeal, that that corporation is still undissolved and subsisting, and allege therein that they are creditors of it, and set up, as valid, an attachment by them for the recovery of their debt against it, which they seek to uphold against the proceedings against it in the probate court; and they appeal on the ground that those proceedings will dissolve that attachment. The ground, therefore, on which their appeal rests, is incompatible with and indeed contradictory to their claim of the utter extinction of that corporation. And by showing, as they claim to have done, that it is so extinguished, they destroy, of course, any claim or right of action against it which can be enforced by means of their attachment, and also the validity of that attachment, since they can not be creditors of or bring a suit against a nonentity. They would thereby place themselves in the condition of one who should appeal from a decree of a court of probate on the ground that he was a creditor of the estate in settlement, but in pursuing his appeal should show in his reasons that his claim against the estate is invalid. It is scarcely necessary to say that such an appeal would be ineffectual. If, however, that corporation, by its merger and union with the other corporations, is dissolved for certain purposes, but yet should be deemed to subsist so as to enable its creditors to proceed against it for the collection of their debts, as may perhaps be the case, and so, therefore, that the appellants, being creditors of it, may treat it as still in existence for that purpose, we are of opinion that it should be considered as also still subsisting for the purpose of enabling any of its creditors to avail themselves of the relief against it which is provided by our insolvent act. (See Ang. & Ames on Corp., ch. 22.)

The proceedings in insolvency in this case before the pro-

bate court, not being therefore against any new or consolidated corporation which may have been formed by the union and merger of other corporations, created by and united under the laws of different states, but only against the original corporation chartered solely by this state, it is unnecessary to consider the question which has been principally argued before us, whether our insolvent law is applicable to such a consolidated corporation, so as to give our courts of probate jurisdiction to dispose of its property or any part thereof, under and according to the provisions of that law.

The question then arises, whether the provisions of that act are applicable to such a corporation as the original New York and Boston Railroad Company chartered by this state; and which is wholly a domestic corporation. The proceedings in this case were at the instance of creditors of that corporation, and not under an assignment made by it, and were therefore involuntary on its part. It is suggested that the act does not expressly authorize proceedings under it against any corporation *in invitum*, and that therefore no such body can be subjected to its operation, unless voluntarily on its part by having made an assignment of its property as provided in the first section. We by no means admit that corporations are not by the terms of the act, and the legal construction of its language, embraced in the other sections which provide for involuntary proceedings against insolvent debtors, and indeed have no doubt that, if it became necessary to decide that point, we should hold that they are embraced by its terms; but looking at the provisions of those other sections in connexion with the first, and especially at the second and fifth sections, there can not be a doubt that the act was intended to extend to corporations as well as to natural persons, and that involuntary proceedings were contemplated under it against the estate of all debtors who are competent to bring themselves voluntarily within its operation by making an assignment of their property. It is next claimed that if the act embraces any corporations, it does not embrace all, and that railroad corporations are among those which are excluded. Municipal corporations, so called, such

as towns, cities, boroughs, school districts, &c., are instanced among those which are claimed not to be within the purview of the act. It may be admitted, and indeed, for reasons too obvious to be detailed, we think, that public bodies of that description were not intended to be subjected to its operation. But none of the reasons for excluding those bodies, growing out of their peculiar character, or the objects of their creation, apply to private corporations for banking, insurance, manufacturing, or trading purposes, or the building of canals, turnpikes or railroads, or the carrying on any other lawful pecuniary business, which are chartered by the state, and reside by construction of law therein. Such corporations created for the private advantage and emolument of the corporators, are, we have no doubt, those which are intended to be embraced by the provisions of our insolvent act. The reasons urged for distinguishing between railroad companies and other private business corporations, do not strike us with any considerable force, while justice obviously requires that the creditors of that particular class of corporations should have the same protection for their debts as is provided for the creditors of other similar corporations. So far as the railroad company itself is concerned, it is entitled to no special immunity in this respect as to its creditors; and as to any inconvenience to the public by the temporary or permanent cessation of its business, consequent upon proceedings in insolvency against them, the necessity of which cessation however is not apparent to us, such inconvenience would be the same in kind, and would differ only in degree, from that which would attend similar proceedings against any of the other private corporations which have been mentioned; and would be the same only as if their business were conducted by natural persons who had become insolvent and therefore liable to those proceedings. The appellants further insist that railroad companies were not intended to be embraced by the insolvent law on the ground that the trustee appointed under it would not be invested with the power of selling, leasing, or operating the railroad, and therefore that the most valuable portion of its property could not be made

available for the payment of its debts. We do not deem it necessary to express any opinion on the legal principle affirmed in this objection ; for if it is correct it falls far short of sustaining the inference claimed from it. That some of the property of the company is of such a peculiar character that the trustee could not, by his own unassisted power, dispose of or manage it for the benefit of creditors, would be an insufficient ground for concluding that the legislature did not intend that they. should have the benefit of such of its property as he could appropriate to their use. And we would add that in regard to other property, if there should be any in which the company would have a valuable interest, without undertaking to prescribe the particular course to be taken with it, which would now be premature, we can not but think that a method could be devised by which it could be made available to creditors.

The .appellants next object to the regularity of the proceedings on the writ of attachment sued out by Platt against the railroad company, on which his petition to put it into bankruptcy was founded, because Stokes, on whom as secretary of the company demand was made by the officer for property sufficient for the security of Platt's claim, and with whom a copy of that writ was left in service, was not then the secretary of the company, for that the directors of the company had previously removed him from said office and appointed one Rice to said office in his place ; and that therefore said demand of Stokes, and the service of said 'writ, were both invalid. These objections do not rest on the ground that Stokes was never the secretary of the company, for it is impliedly admitted by the appellants in their reasons, and the argument has proceeded on the concession, that he had been its secretary, but upon the claim that Rice had been appointed in his place ; for if he had not, Stokes obviously retained the office. On the facts found, we think it plainly appears that whatever action was taken in respect to Rice, was not taken by the railroad company against which the proceedings before the probate court were instituted, but by what is claimed to be the new con-

solidated corporation formed by the merger and union before-mentioned, and that it was of the latter company only, if any, that Rice was appointed the secretary. It is obvious that such an appointment by that corporation did not have the effect of removing Stokes from his office of secretary of another subsisting and distinct corporation, the one which was the party to the proceedings in the court of probate. To the objection that the writ was not legally served on the company, it is also a sufficient answer that the insolvent act requires no service of the writ sued out by the petitioner to the probate court to be made on a debtor, in order to lay the foundation for an application to that court for the appointment of a trustee on his estate. All that is required for that purpose, and in order to give that court jurisdiction, is, that the debtor shall refuse to show to the officer, and that the latter shall be unable to find, sufficient property of the debtor to secure the attachment against him, and that the officer shall make a return to that effect to the court of probate. The very reason why the creditor may apply for a trustee, is, that the debt can not be realized by an ordinary suit. If property could be found to satisfy it on the attachment, the debt could be collected in that suit, and an application to the court of probate would become unnecessary. It is therefore immaterial to the validity of the proceedings before the court of probate, whether the attachment on which they are founded is served on the debtor or not, since such service could be important only with reference to the further prosecution of the suit in the court to which the writ is returnable.

The appellants further claim that there was no legal notice to the railroad company of the petition to the court of probate for the appointment of a trustee. It appears that the company appeared before that court on that petition by its attorney, that no objection was ever made to the want of such notice or to the jurisdiction of the court on that or any other account, that a time was fixed by the court within which the company should file their pleadings and answer to the petition, and subsequently for the hearing of the case,

and that the hearing was afterwards repeatedly adjourned, and that all of these proceedings took place on the motion of the company by its attorney. After these proceedings it is too late for the company to set up a want of notice on the petition. Such an appearance cured any defect in or want of notice if it were otherwise insufficient. And we also think that the company having thus appeared and waived any objection on that ground, it is not competent for the appellants to avail themselves of that objection. It was an objec- .tion in its nature personal to the company, and of which they only could complain, and they having waived it, the proceedings in the probate court in this respect are unexceptionable.

The appellants also claim that when the proceedings were commenced, the company had no office or place of business in the Middletown probate district, and that therefore the court of probate for that district had no jurisdiction of the case. Without considering the manner in which the company conducted its affairs after its supposed union with the two other railroad companies with which it became connected, and which united companies had an office in Middletown for the transaction of their business, we think that the office of the original Connecticut corporation must be deemed, for the purposes of the present proceedings, to have remained in Middletown, which is within that probate district. It had its office there when it was organized, and for a considerable period afterwards, and indeed down to the time of its connexion with the other railroad companies, and it does not appear that it has ever been removed to any other place. We are of opinion, even if it had ceased doing business before the proceedings in insolvency, that for the purpose, at least, of rendering them amenable to the provisions of our insolvent act, that should be considered as having continued to be their place of business within the intent of that act. The idea that an insolvent corporation having an office where its business is transacted, can, by discontinuing its business, defeat the relief which is provided for its creditors by our insolvent law, is not susceptible of a plausible vindication. Its

office would, for the purpose of jurisdiction and the administering of justice, be deemed to remain where it was when it ceased doing business. (See *Evarts* v. *Killingworth Manufacturing Co.*, 20 Conn., 447.)

The claim that the judge of probate was disqualified to act in this case, because he had been retained or consulted as attorney or counsel in matters appertaining to the settlement of the estate in question, is plainly unfounded. By the first section of the twenty-fifth chapter of the acts of 1855, on which the appellants rely, it was optional with the judge to act, if he had been so retained or consulted, unless some person interested in the estate objected, and in the present case no objection was made.

We therefore advise that the orders and decrees of the probate court appealed from, be affirmed.

In this opinion the other judges concurred

Decrees of probate to be affirmed.